# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF MISSOURI
# EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| Plaintiff, ) | |
| v. ) | Case No. 4:23-cr-00428-MTS |
| DEONTAE' TRE'VON OVERALL, ) | |
| Defendant. ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on Defendant's Motion for New Trial, Doc. [119]. On September 11, 2024, following a jury trial, Defendant Deontae' Tre'von Overall was found guilty for knowingly and intentionally distributing fentanyl, a Schedule II controlled substance resulting in death. For the following reasons, the Motion is denied.

### I. Legal Standard

In considering a motion for new trial under Rule 33(a) "the court may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "[T]he court need not view the evidence in the light most favorable to the verdict, and it is permitted to weigh the evidence and evaluate the credibility of the witnesses." *United States v. Hassan*, 844 F.3d 723, 725-26 (8th Cir. 2016). "[T]he court has broad discretion in deciding motions for new trial, and its decision is subject to reversal only for a clear and manifest abuse of discretion." *Id.* at 725. The granting of a new trial under Rule 33 is a remedy to be used only "sparingly and with caution." *United States v. Campos*, 306 F.3d 577, 579 (8th Cir. 2002).

## II. <u>Claims of Error</u>

### a. **Emotional Reactions of Witness and Observers in Gallery**

Prior to trial, Defendant motioned the Court to sequester Government witnesses from the courtroom, but the Government requested that the Victim's mother, Stacy Carlile, "be allowed in the courtroom for opening statements despite being a Government witness." Doc. [119] at 2. Defendant did not oppose the request. *Id*. Defendant claims that during opening statements and during Carlile's testimony, members of the victim's family as well as Carlile "audibly and visibly cried in the presence of the jury." Doc. [119] at 2. Defendant acknowledged that the Court took corrective action on the first day of trial when it noted emotional displays from observers in the gallery. The Court asked counsel for the Government to convey (through its victim-witness advocate) to observers that they would need to leave the courtroom if such emotional displays continued. Doc. [126] at 281. Despite the Court's corrective action, Defendant claims that that "jurors' ability to objectively weigh the facts without consideration of non-evidentiary factors such as sympathy for [the Victim's] family" was "negatively impacted." *Id*.

The brief displays of emotion from Carlile and others in the gallery did not prejudice the Defendant. The Court instructed the jurors prior to the start of trial that they should "not allow sympathy or prejudice to influence [them]. The law demands of you a just verdict, unaffected by anything except the evidence, your common sense, and the law as I give it to you." *Id*. at 204. Defendant did not object to Carlile's testimony or alert the Court to his concerns as to the displays of emotion he referenced; rather the Court took corrective action sua sponte. Further, Defendant does not cite a legal basis or any legal authority for his claim that brief displays of emotion by Carlile and others in the gallery entitle him to a new trial. Doc. [129] at 2. This claim is denied.

### b. Stacy Carlile & Devin Daffner's Testimony

Defendant claims Carlile "provided materially false testimony." Doc. [119] at 2. "Specifically, Stacy denied ever informing law enforcement on December 4, 2022, that Devin Daffner had communicated with her family about [Victim] being sick and vomiting on December 3, 2022, prior to [Victim's] death." *Id*. Defendant refers to testimony at trial and previous out-of-court statements by other witnesses to support his claim. *Id*. 2-5. At trial, Defendant and the Government stipulated that there was body cam footage contradicting the in-court statement made by Carlile. Doc. [126] at 255.[1] Defense counsel had the opportunity at trial to cross-examine Carlile regarding her statements to the police and had the opportunity to impeach her testimony in the presence of the jury with the stipulation.[2]

Next, Defendant asserts that Daffner, another Government witness, provided testimony that "was also characterized by omissions and misleading statements-both prior to and during trial." Doc. [119] at 2-3. Defendant then lists various testimony of Daffner from the trial. Defendant then asserts his conclusion that Daffner's testimony "raised significant concerns about the accuracy and completeness of the investigation which raise doubts about the reliability of Government/s witnesses' testimony." Doc. [119] at 5. Once again, Defendant had the opportunity at trial to cross-examine Daffner regarding any inconsistencies. Further, Daffner's testimony is

---

[1] Defendant attempted to introduce a body-worn camera video showing Carlile, shortly after finding her son deceased, speaking to police. The Government objected to the introduction of the video on hearsay grounds, as it depicted Carlile conveying information she received from her daughter, who was supposedly in contact via text with Daffner. The Court overruled the Government's objection; however, Defense Counsel was unable to get the video to play. In lieu of playing the video, the parties stipulated that, if played, the body cam video would reflect that Carlile said something to the effect that she had heard Victim say he did not feel well, vomited a couple times, and indicated the source of that information was Daffner. *Id.*

[2] On re-direct, Carlile testified that she herself did not personally have any contact with Daffner and that she was getting information from her daughter, who was trying to reach Daffner. Doc. [126] at 258. She also testified as to her emotional state the night she found her son and spoke to police, stating "I was a mess." *Id*. at 259.

3

consistent with his initial interview with law enforcement after Victim's death and was corroborated by the DEA investigation that followed his initial interview.

It must be noted that Defendant does not cite any legal authority to support his claims, and after weighing the evidence and assessing witness credibility, this Court does not find that the evidence "preponderates heavily against the verdict" such that a miscarriage of justice may have occurred. *United States v. Oliver*, 950 F.3d 556, 566 (8th Cir. 2020) (citing *United States v. Knight*, 800 F.3d 491, 504 (8th Cir. 2015)). These claims are denied.

### c.  Reliance on Improper Evidence

Defendant claims that the following evidence regarding Defendant's drug dealing was improperly admitted.

### 1.  Evidence of DEA's Controlled Buys

Defendant claims that the Government improperly introduced evidence regarding the distribution of controlled substances related to a series of undercover buys that occurred in the summer of 2023. Doc. [119] at 5. Defendant claims that the evidence should not have been allowed because Defendant had pleaded guilty to the distribution of controlled substances count prior to trial, and therefore, the events were "no longer factually at issue" because the only count to be decided by the jury related to a distribution that occurred on December 3, 2022. *Id.* The Government counters in its Response that DEA investigators coordinated a series of controlled buys from the telephone number 314-390-8707, which allowed them to identify and ultimately arrest Defendant. Doc. [129] at 6. This evidence was subject to pretrial rulings, in which this Court determined this evidence was intrinsic and appropriate under Federal Rule of Evidence 404(b). Doc. [88] at 13. Defendant was directed by the Court to make any specific objections as evidence was presented.

4

"Evidence of other wrongful conduct is considered intrinsic when it is offered for the purpose of providing the context in which the charged crime occurred." *United States v. Young*, 753 F.3d 757, 770 (8th Cir. 2014). "Intrinsic evidence may help to fill the gaps in the jury's understanding of the crime charged." *Id*. Here, the drug sales by Defendant to Daffner and later to the undercover officer (including the sale that was basis of Count 2), as well as the execution of the search warrant and the arrest of Defendant "completes the story" and provides a "total picture" of the charged fentanyl distribution. The controlled purchases of fentanyl from Defendant illustrate how investigators were able to get in contact with Defendant and determine that he, in fact, was the individual utilizing the 314-390-8707 number to sell fentanyl and that he had sold fentanyl to Victim from 856 Elias on the night of Victim's death. Doc. [129] at 7. This claim is denied.

## 2. Text Messages from Defendant's Phone

Defendant next claims the text messages from Defendant's phone that purportedly describe drug transactions were improperly admitted at trial. Doc. [119] at 6. The extent of Defendant's argument on this matter is that he objected to the admission of the messages throughout the trial, "including grounds such as the other halves of the conversations containing hearsay, the messages lacking foundation,[3] and the fact that parts of the messages were not subject to cross-examination." *Id*. at 5. During a pretrial conference, this Court made a preliminary ruling that the text messages were "intrinsic and appropriate under 404(b)" and that defense counsel could make any hearsay objections at trial. Doc. [88] at 13-15. At trial, Defendant objected to the text messages, and in response, the Government cited *United States v. Turner*, 934 F.3d 794, 798-99 (8th Cir. 2019),

---

[3] Defendant's objection as to foundation was overruled. *See* Doc. [128] at 15-17. The party seeking to authenticate an exhibit need only prove a rational basis for the party's claim that it is what it is asserted to be. See *Turner*, 934 F.3d 794 at 798 (citing *United States v. Neeham*, 852 F.3d 830, 836 (8th Cir. 2017)).

5

arguing that neither side of the text messages was hearsay because they contained statements by an opposing party and Defendant's text messages would be meaningless without the messages from the other side. Doc. [128] at 3-6. Defense counsel's objections were overruled, and the text messages were admitted into evidence. *Id*. at 5-6.

The text message statements by Defendant constitute a party admission and are not hearsay. *See* Fed. R. Evid. 801(d)(2)(A) (statements made by and offered against an opposing party are not hearsay); *Turner*, 934 F.3d at 799 (applying Rule 801(d)(2) to text messages). Further, "[w]here a defendant's admissions are part of a conversation with a third party who is not a witness, the court has discretion to admit the non-witness's statements when they make the defendant's responses 'intelligible to the jury and recognizable as admissions.'" *United States v. Lemons*, 792 F.3d 941, 947 (8th Cir. 2015) (quoting *United States v. Stelten*, 867 F.2d 453, 454 (8th Cir. 1988) (per curiam)). This claim is denied.

### d.  Other Contents of Defendant's Phone and Edward Clay's Testimony

Defendant claims that he suffered unfair prejudice because the Government's expert witness, Edward Clay, was not qualified to opine about certain facts since he did not have "background or education in language, linguistics, or any other formal training which would make him an expert on slang terms on usage," he lacked knowledge of the context of the items that were necessary to establish foundation necessary to speak about the pictures, notes, or messages he examined, and that "the introduction of evidence during his testimony concerning drugs, guns, money, and rap lyrics from the Defendant's phone related to unspecified dates." Doc. [119] at 6. Defense counsel objected to Clay's testimony outside the hearing of the jury in advance of his testimony and once again prior to his taking the stand. *See* Doc. [128] at 6-8 and 120-21.

"A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise" Fed. R. Evid. 702. The Eighth Circuit has held that on-the-job and field experience equates to "expertise" regarding drug trafficking. *United States v. Delpit*, 94 F.3d 1134, 1145 (8th Cir. 1996). Further, "[l]aw enforcement officers may testify as experts concerning the modus operandi of drug dealers as such activities are not something with which most jurors would be familiar." *United States v. Placensia*, 352 F.3d 1157, 1164-65 (8th Cir. 2003). "Significantly, we have held experts may help the jury with the meaning of jargon and code words." *Id*. Such testimony is often important, because "[t]here is no more reason to expect unassisted jurors to understand drug dealers' cryptic slang than antitrust theory or asbestosis." *Delpit*, 94 F.3d at 1145.

Clay testified that he had been a St. Louis Metropolitan Police officer for over 34 years, and for over 23 of those years he was a task force officer with the DEA. Doc. [128] at 101. He also testified that during his career he has investigated many drug crimes and drug organizations. He has made undercover drug buys, handled confidential informants, initiated wiretap interceptions, and participated in specialized training regarding the investigation of drug crimes. *Id*. Therefore, Clay was qualified to interpret the different slang words and decipher their meaning for the benefit of the jurors in understanding the evidence put before them. This claim is denied.

  e. **Failure to Investigate and Disclose Additional Suspects**

Defendant claims he is entitled to a new trial due to the DEA's failure to investigate and disclose additional suspects, including other possible sources of drugs that Daffner told the police about, including Daniel Pauline and a "long haired guy from Mellow Mushroom." Doc. [119] at 7. Kevin Walsh, a St. Louis County Police Department Detective assigned to the case testified on cross-examination that he believed he knew the identity of the "long haired guy from Mellow

7

Mushroom" because he had reviewed Daffner's interview with St. Louis County Police Officer Michael Wadlow. During the interview, Daffner told Officer Wadlow that this individual had sold drugs to Victim prior to, but not on the night of Victim's death, and that he believed the individual worked at Mellow Mushroom with Pauline. On re-direct, Detective Walsh clarified that he believed the identity of the "long haired guy from Mellow Mushroom" was Harry Tuttle, an individual identified in a redacted DEA-6 report that describes Detective Walsh's interview with Pauline and referred to Harry Tuttle as "HT."[4] This claim is denied.

### III. Conclusion

Upon review of Defendant's arguments set forth above, this Court declines to grant Defendant a new trial.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant's Motion for New Trial, Doc. [119], is **DENIED**.

Dated this 4th day of December, 2024

_____
MATTHEW T. SCHELP
UNITED STATES DISTRICT JUDGE

---

[4] The Government's Response includes a full account of the evidence set forth at trial and disclosed to Defense Counsel concerning this issue; this includes the colloquy in which Defense Counsel was given the opportunity to re-examine the report, re-cross Detective Walsh, and ultimately withdraw his objection that he had not received it from the Government as required under the *Jencks Act*. *See* Doc. [129] at 11-15 and Doc. [128] at 66-68.